**IN THE UNITED STATES DISTRICT COURT
FOR THE NOTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| JARED ABRAMS, Derivatively on Behalf of BEAZER HOMES USA, INC., | Case No.: _____ |
| Plaintiff, | |
| v. | **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** |
| ALLAN P. MERRILL, ROBERT L. SALOMON, STEPHEN P. ZELNAK, JR., BRIAN C. BEAZER, ELIZABETH S. ACTON, LAURENT ALPERT, PETER G. LEEMPUTTE, PETER M. ORSER, NORMA A. PROVENCIO, DANNY R. SHEPHERD, and LARRY T. SOLARI | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| -and- | |
| BEAZER HOMES USA, INC., | |
| Nominal Defendant. | |

Plaintiff Jared Abrams ("Plaintiff"), by and through his undersigned counsel, derivatively on behalf of nominal defendant Beazer Homes USA, Inc. ("Beazer" or the "Company"), submits this Verified Stockholder Derivative Complaint against the Individual Defendants (defined herein) and alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which included, *inter alia*, review and analysis of: (i) Beazer's regulatory filings with the United States Securities and Exchange Commission ("SEC"); (ii) press releases issued and disseminated by Beazer; (iii) a purported class action lawsuit filed in the United Stated District Court for the Southern District of New York

against Beazer and defendants Allan P. Merrill ("Merrill") and Robert L. Salomon ("Salomon") alleging violations of the federal securities laws based on the alleged issuance of false and misleading statements of material fact and the alleged omission of material facts necessary to make other issued statements not misleading between August 1, 2014 and May 2, 2019 with respect to the value of Beazer's California assets classified as land held for future development; and (iv) other publicly available information, including media and analyst reports, concerning Beazer.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a stockholder derivative action brought by Plaintiff on behalf of nominal defendant Beazer against certain of its officers and members of the Company's Board of Directors (the "Board").  Plaintiff seeks to remedy the Individual Defendants' violations of federal and state laws from August 1, 2014 through the present (the "Relevant Period") that have caused and continue to cause substantial monetary damage to Beazer and other damages, including damages to its reputation and goodwill.  Plaintiff asserts claims for breach of fiduciary duty, unjust enrichment, and a federal claim of contribution derivatively on behalf of the Company arising under Sections 10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Beazer was founded in 1985 and is headquartered in Atlanta, Georgia.  Beazer is one of the largest homebuilders with homes for sale in the United States.  The Company designs, constructs, and sells single-family and multi-family homes, focusing on entry-level, move-up, and retirement-oriented home buyers.

3.      Despite the substantial deflation in home and land values caused by the 2008 housing crisis, Beazer failed to lower the value of its land held for future development in California, and instead reported inflated values for these holdings while claiming to frequently perform impairment analyses.  The truth was revealed on May 2, 2019 when defendants were forced to reveal the need for an impairment charge of almost $150 million on the Company's

California assets acquired before 2007 and currently or previously classified as land held for future development, with defendant Merrill admitting that the land had not been impaired "since 2007 or [20]08." This news wiped out $55 million in market capitalization in a single day and over 56% of the Company's market capitalization during the Relevant Period by May 13, 2019.

4. The Individual Defendants breached their fiduciary duties of loyalty, good faith, due care, oversight, and candor by willfully engaging in the deceptions alleged herein. Further, the Individual Defendants' false and misleading statements as alleged herein have subjected Beazer to a complaint for violations of the federal securities laws filed in the United States District Court for the Southern District of New York, captioned *Strougo v. Beazer Homes USA, Inc. et al.*, Case No. 1:19-cv-05301 (the "Securities Class Action").

5. As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, Beazer has sustained damages as described below.

## JURISDICTION AND VENUE

6. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because the Complaint alleges a federal claim of contribution derivatively on behalf of Beazer arising under Sections 10(b) and 21D of the Exchange Act, 15 U.S.C. § 78u-4. This Court has exclusive jurisdiction over the federal securities laws claims under Section 27 of the Exchange Act (15 U.S.C. § 78aa) and supplemental jurisdiction over the pendent state law claims pursuant to 28 U.S.C. § 1367(a) because the state law claims form part of the same case or controversy. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

7. This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who resides in this District or has sufficient minimum contacts with this District

to render the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice.

8.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because nominal party Beazer maintains its principal executive offices in this District, one or more of the defendants either resides in or maintains offices in this District, a substantial portion of the transactions and wrongs complained of herein, including defendants' primary participation in the wrongful acts detailed herein and violation of fiduciary duties owed to Beazer occurred in this District, and/or defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

9.     Plaintiff is a stockholder of Beazer, was a stockholder of Beazer at the time of the wrongdoing alleged herein, and has been a stockholder of Beazer continuously since that time.

### Nominal Defendant Beazer

10.     Nominal Defendant Beazer is a Delaware corporation with its principal executive offices at 1000 Abernathy Road, Suite 260, Atlanta, Georgia 30328.  Beazer's securities trade on the New York Stock Exchange under the symbol "BZH."

### The Individual Defendants

11.     Defendant Merrill has served as the Company's President and Chief Executive Officer ("CEO") since June 2011, and as a director since February 2013.  Merrill joined Beazer in May 2007 as Executive Vice President ("EVP") and Chief Financial Officer ("CFO").  Merrill is a named defendant in the related Securities Class Action.  During the Relevant Period, Merrill received the following compensation:

4

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|--------------|----------------------------------------|------------------------|-------|
| 2018 | $949,231 | $3,030,152 | $2,064,537 | $108,250 | **$6,152,170** |
| 2017 | $900,000 | $2,380,694 | $2,380,849 | $110,023 | **$5,771,566** |
| 2016 | $900,000 | $2,375,372 | $1,442,957 | $162,982 | **$4,881,311** |
| 2015 | $900,000 | $2,437,508 | $1,474,021 | $107,950 | **$4,919,479** |
| 2014 | $900,000 | $4,884,775 | $1,469,337 | $107,800 | **$8,047,332** |

12.    Defendant Salomon has served as Beazer's EVP and CFO since June 2011, and as the Company's Chief Accounting Officer since February 2008.  Salomon is a named defendant in the related Securities Class Action.  During the Relevant Period, Salomon received the following compensation:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|--------------|----------------------------------------|------------------------|-------|
| 2018 | $549,616 | $1,023,342 | $845,092 | $83,273 | **$2,501,323** |
| 2017 | $525,000 | $972,101 | $925,886 | $80,882 | **$2,503,869** |
| 2016 | $525,000 | $969,951 | $579,022 | $57,875 | **$2,131,848** |
| 2015 | $525,000 | $995,301 | $629,792 | $57,875 | **$2,207,968** |
| 2014 | $506,250 | $1,567,555 | $571,409 | $57,856 | **$2,943,764** |

13.    Defendant Stephen P. Zelnak, Jr. ("Zelnak") has served as a director of Beazer since February 2003 and as the Company's Non-Executive Chairman of the Board since February 2015.  Zelnak serves as a member of Beazer's Audit and Nominating and Corporate Governance Committees.  He served as a member of the Company's Audit Committee throughout the Relevant Period.  During the Relevant Period, Zelnak received the following compensation as a director:

| Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|------|------------------------------|--------------|-------|
| 2018 | $150,000 | $199,997 | **$349,997** |
| 2017 | $150,000 | $199,997 | **$349,997** |
| 2016 | $150,000 | $200,012 | **$350,012** |
| 2015 | $126,043 | $200,018 | **$326,061** |
| 2014 | $77,000 | $62,681 | **$139,681** |

14.     Defendant Brian C. Beazer ("B. Beazer") is the Company's founder and has served as a director of Beazer since at least 1994, the time of the Company's initial public offering.  He has served as the Company's Chairman Emeritus of the Board since February 2015.  From 1994 until February 2015, B. Beazer served as the Non-Executive Chairman of the Board.  B. Beazer serves as a member of Beazer's Compensation and Nominating and Corporate Governance Committees.  During the Relevant Period, B. Beazer received the following compensation as a director:

| Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|------|------|------|------|
| 2018 | $95,000 | $99,988 | **$194,988** |
| 2017 | $95,000 | $99,992 | **$194,992** |
| 2016 | $95,000 | $100,006 | **$195,006** |
| 2015 | $139,779 | $134,806 | **$274,585** |
| 2014 | $225,000 | $141,032 | **$366,032** |

15.     Defendant Elizabeth S. Acton ("Acton") has served as a director of Beazer since May 2012.  She serves as the Chair of the Finance Committee and as a member of the Audit Committee.  During the Relevant Period, Acton received the following compensation as a director:

| Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|------|------|------|------|
| 2018 | $107,500 | $99,988 | **$207,488** |
| 2017 | $107,500 | $99,992 | **$207,492** |
| 2016 | $107,500 | $100,006 | **$207,506** |
| 2015 | $100,125 | $100,003 | **$200,128** |
| 2014 | $90,000 | $62,681 | **$152,681** |

16.     Defendant Laurent Alpert ("Alpert") has served as a director of Beazer since February 2002.  Alpert serves as Chair of the Nominating and Corporate Governance Committee and as a member of the Finance Committee.  During the Relevant Period, Alpert received the following compensation as a director:

| Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|------|------|------|------|
| 2018 | $105,000 | $99,988 | **$204,988** |
| 2017 | $105,000 | $99,992 | **$204,992** |
| 2016 | $105,000 | $100,006 | **$205,006** |
| 2015 | $99,750 | $100,003 | **$199,753** |
| 2014 | $84,000 | $62,681 | **$146,681** |

17.     Defendant Peter G. Leemputte ("Leemputte") has served as a director of Beazer since August 2005.  Leemputte serves as a member of the Audit and Finance Committees.  During the Relevant Period, Leemputte received the following compensation as a director:

| Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|------|------|------|------|
| 2018 | $99,600 | $99,988 | **$199,588** |
| 2017 | $105,000 | $99,992 | **$204,992** |
| 2016 | $105,000 | $100,006 | **$205,006** |
| 2015 | $98,250 | $100,003 | **$198,253** |
| 2014 | $84,500 | $62,681 | **$147,181** |

18.     Defendant Peter M. Orser ("Orser") has served as a director of Beazer since February 2016.  Orser serves as Chair of the Compensation Committee and as a member of the Finance Committee.  During the Relevant Period, Orser received the following compensation as a director:

| Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|------|------|------|------|
| 2018 | $101,650 | $99,988 | **$201,638** |
| 2017 | $95,000 | $99,992 | **$194,992** |
| 2016 | $62,899 | $66,127 | **$129,026** |

19.     Defendant Norma A. Provencio ("Provencio") has served as a director of Beazer since November 2009.  Provencio serves as a member of the Compensation and Nominating and Corporate Governance Committees.  She served as the Chair and as a member of the  Audit Committee from at least December 2013 to at least December 2017.  During the Relevant Period, Provencio received the following compensation as a director:

| Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|------|------|------|------|
| 2018 | $100,438 | $99,988 | **$200,426** |
| 2017 | $110,000 | $99,992 | **$209,992** |
| 2016 | $110,000 | $100,006 | **$210,006** |
| 2015 | $102,000 | $100,003 | **$202,003** |
| 2014 | $900,000 | $62,681 | **$152,681** |

20.     Defendant Danny R. Shepherd ("Shepherd") has served as a director of Beazer since November 2016.  Shepherd serves as Chair of the Audit Committee and as a member of the Compensation Committee.   During the Relevant Period, Shepherd received the following compensation as a director:

| Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|------|------|------|------|
| 2018 | $105,813 | $99,988 | **$205,801** |
| 2017 | $97,500 | $99,992 | **$197,492** |

21.     Defendant Larry T. Solari ("Solari") served as a director of Beazer from at least February 1994 to February 2017, and as Lead Independent Director from February 2013 to February 2015.  During the Relevant Period, Solari received the following compensation as a director:

| Year | Fees Earned or Paid in Cash | Stock Awards | Total |
|------|------|------|------|
| 2017 | $23,750 | $0 | **$23,750** |
| 2016 | $95,000 | $100,006 | **$195,006** |
| 2015 | $89,750 | $100,003 | **$189,753** |
| 2014 | $79,025 | $62,681 | **$141,706** |

22.     Defendants Merrill, Salomon, Zelnak, B. Beazer, Acton, Alpert, Leemputte, Orser, Provencio, Shepherd, and Solari are collectively referred to herein as the "Individual Defendants."

### DUTIES OF THE INDIVIDUAL DEFENDANTS

23.     By reason of their positions as officers and/or directors of Beazer and because of their ability to control the business and corporate affairs of the Company, the Individual

Defendants owed and owe the Company and its stockholders the fiduciary obligations of good faith, loyalty, trust, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

24.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, directly and/or indirectly exercised control over the wrongful acts complained of herein.

25.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company. By virtue of such duties, the officers and directors of Beazer were required to, among other things:

      a.    Ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

      b.    Conduct the affairs of the Company in a lawful, efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

    c.      Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company;

    d.      Properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

    e.      Remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

    f.      Ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

26.    Each Individual Defendant, as a director and/or officer, owed to the Company and its stockholders the fiduciary duties of loyalty, good faith, and candor in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a conscious disregard for their duties to the Company and its

stockholders that Individual Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

## SPECIFIC CORPORATE GOVERNANCE
## RESPONSIBILITIES OF THE INDIVIDUAL DEFENDANTS

27.     The Company has adopted a Code of Business Conduct and Ethics (the "Code") "as an overview of guiding principles."  "Compliance with the Code is mandatory" and it applies to "all Directors and Employees of the Company" including Beazer's senior financial officers. The Code states in relevant part:

**2.0    DUTY TO DISCLOSE AND REPORT**

In addition to a duty to adhere to the Code and disclose any personal violations, Employees and Directors also have an obligation to report known or suspected violations of the Code, including situations in which the Company could be implicated as a result of unlawful conduct.  If an Employee or Director knows or suspects a violation of the Code, that person must report the situation to the Company's General Counsel or Compliance Officer or, alternatively, to the Company's Ethics Hotline by calling:

**1-866-457-9346**

A report also may be submitted by completing a form via the website address below ("Online Form"), which address can also be found on the Company's Internet:

**https://www.integrity-helpline.com/Beazer.jsp**

Both the Ethics Hotline and Online Forms are operated by an independent third- party company.  No report submitted through the Ethics Hotline or an Online Form that addresses conduct or actions of a specific individual will be delivered to that individual.

If you choose, you may report any concerns on an anonymous basis via the Ethics Hotline or an Online Form.  For Employees submitting reports by any other means and wishing to remain anonymous, reasonable steps will be taken to ensure that the identity of the reporting Employee is kept confidential.

The Company is committed to providing an open and honest environment, and any reports, whether made to an individual, to the Ethics Hotline, through an Online Form or otherwise, will be handled in a fair and respectful manner.  Reports will be shared only with appropriate personnel, including the Company's Compliance Officer.  To protect the rights of each Employee, no attempt to

discipline or retaliate against any Employee for reporting in good faith known or suspected violations of the Code, Laws and Regulations or Company policies will be permitted or tolerated.  If you believe you have been subject to harassment or retaliation, you should contact the Company's General Counsel, the Company's Head of Human Resources, a representative of the Human Resources Department or the Company's Compliance Officer.

Additionally, stockholders and other interested parties wishing to communicate directly with the Non-Executive Chairman of the Board or non-management Directors as a group may do so by addressing their communications to the Ethics Hotline and specifically referencing them as communications for the Non-Executive Chairman or non-management Directors.

The names and phone numbers for the individuals to whom known or suspected violations of the Code may be reported, as well as information related to the Ethics Hotline and Online Forms, can be found in the Guidelines.

### 2.1.   Investigations

All reports of known or suspected violations will be taken seriously, and, if warranted, investigated in compliance with all relevant Laws and Regulations.

### 2.2.   Consequences

If it is determined that there have been violations of the Code, including unlawful conduct, a designated person shall determine the appropriate actions to be taken.  Such actions shall be reasonably designed to deter wrongdoing and to promote accountability for adherence to the Code, and may include but are not limited to, disciplinary action, up to and including termination or in the case of a Director, removal from the Board.  In determining what action is appropriate in a particular circumstance, the designated person(s) will consider all relevant information, including, for example, the nature and severity of the violation, whether the violation was a single occurrence or repeated occurrences, whether the violation appears to have been intentional or inadvertent, whether the Employee(s) in question had been advised prior to the violation as to the proper course of action and whether the Employee(s) in question had committed other violations in the past.

## 3.0   COMPLIANCE WITH ALL LAWS, RULES AND REGULATIONS

The Company is committed to ensuring compliance with all applicable federal, state and local laws and with all applicable rules and regulations set forth by governmental authorities, stock exchanges on which the Company's shares are listed and any other regulatory bodies (collectively "Laws and Regulations"). Employees and Directors must strive to comply at all times with all Laws and Regulations in connection with their service as Employees and/or Directors of the Company.

If it is unclear whether an action being considered would violate applicable Laws and Regulations, you should seek advance guidance from the Company's General Counsel or Compliance Officer.

Violations of applicable Laws and Regulations may subject Employees to disciplinary action, up to and including termination or removal from the Board (in the case of a Director).

*      *      *

## 6.0    ACCOUNTING PRACTICES AND INTEGRITY OF RECORDS

The accuracy and reliability of the Company's financial and business records is of utmost importance to the decisions the Company makes and to the Company's compliance with its financial, legal and reporting obligations.  It is the policy of the Company to fully and fairly disclose the financial condition of the Company in compliance with all applicable accounting principles, and Laws and Regulations.  All business records, expense accounts, vouchers, bills, payrolls, service records, reports to government agencies and other such reports must accurately reflect the facts they represent.

It is the Company's policy to make full, fair, accurate, timely and understandable disclosures in all periodic reports required to be filed by the Company with the Securities and Exchange Commission, as required by applicable Laws and Regulations.  All books and records of the Company shall be kept in such a way as to fully and fairly reflect all Company transactions in accordance with the Generally Accepted Accounting Principles of the United States of America ("GAAP").  False and misleading entries in such records are unlawful and are not permitted, and no undisclosed or unrecorded funds or assets shall be established for any purpose.

The Company maintains a system of internal controls as provided for by all applicable Laws and Regulations.  A detailed description of the Company's internal control policies and procedures can be found on the Company's Intranet, and you must report any deficiencies that could adversely affect the Company's ability to record, process, summarize or report financial data in a full, fair and accurate manner.

The Company's public or certified public accountants shall be given access to all information necessary for them to conduct a proper audit.  Employees must not take any action, nor may they direct any others to take any action, to fraudulently influence, coerce, manipulate or mislead any public or certified public accountant engaged in the audit or review of the Company's financial statements for any purpose, including for the purpose of rendering those financial statements misleading.  Similarly, no Employee shall take any such action at the direction of any other Employee.  Any such actions taken at the direction of another Employee will be deemed to have been made "for the purpose of" rendering the financial

statements misleading if the Employee involved knew or was unreasonable in not knowing the improper influence, if successful, would result in rendering financial statements misleading.

The knowing or deliberate falsification of any documents may be the basis for immediate discharge and may subject an Employee to civil and/or criminal sanctions. As with any known or suspected violation of any provision of the Code, it is critical that you immediately report any known or suspected violations of this Section 6.0.

28.    The Board has also adopted Corporate Governance Guidelines ("Guidelines") "to provide high level standards and policies with respect to the Board and to help it fulfill its responsibility to the stockholders to oversee the work of management and the Company's business results." The Guidelines are "also intended to align the interests of directors with those of Beazer's stockholders." The Guidelines state in relevant part:

The Board is responsible for oversight of management's strategy and operation of the business and performance evaluation, so as to promote the long-term successful performance of the Company and to maximize long-term stockholder value. Accordingly, the directors' primary functions include:

- Assessing management's efforts to develop sound business strategies;

- Assessing and monitoring the Company's financial results and risks;

- Reviewing, and where appropriate, approving and evaluating financial and internal controls;

- Selecting and evaluating the performance of the CEO, reviewing management succession planning, and when necessary selecting a replacement for the CEO;

- Assessing Company policies and procedures and monitoring management's efforts to promote high standards of ethical conduct and legal compliance in the conduct of Company business; and

- Reviewing actions taken by Board committees on major issues delegated to them.

29.    One of the Board's designated committees is the Audit Committee. The Audit Committee's Charter states in pertinent part:

The purpose of the Committee is to assist the Board in overseeing:

A.      The integrity of the Company's financial statements as well as systems of internal controls regarding finance, accounting, legal compliance and ethics that management and the Board have established;

B.      The Company's compliance with legal and regulatory requirements;

C.      The qualifications and independence of the Company's independent auditors;

D.      The Company's financial, legal and regulatory risk exposure;

E.      The Company's risk assessment and risk management processes;

F.      The performance of the Company's internal audit function and independent auditors; and

G.      The review of certain related party transactions and conflicts of interest.

30.     The Audit Committee's responsibilities and duties include the following:

The Committee is to perform activities required by applicable law, rules or regulations, including the rules of the Securities and Exchange Commission ("SEC") and any stock exchange or market on which the Company's securities may be listed from time to time for Audit Committees of publicly traded companies, and perform such other activities that are consistent with this Charter, the Company's Bylaws and governing laws, as the Committee or the Board deem necessary or appropriate.  Without limiting the foregoing, the Committee's responsibilities are to:

A.      <u>Integrity of Financial Statements</u>.

1.      Meet to review and discuss the Company's annual and quarterly financial statements with management and the independent auditors, including disclosures under the heading "Management's Discussion and Analysis of Financial Condition and Results of Operations";

2.      Discuss with management earnings press releases and financial information and earnings guidance provided to analysts and rating agencies;

3.      Report at least quarterly to the full Board regarding any issues that arise relating to, among other things, financial reporting and compliance and auditor independence;

4.      Review any internal audit reports;

5.      Review with the independent auditor and management major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles, the effect of regulatory and accounting initiatives and off-balance sheet transactions on the financial statements and analyses prepared by management and/or the independent auditors on significant financial reporting issues and judgments; and

6.      Establish procedures to receive, retain and address complaints regarding accounting, internal control or auditing issues and employees' anonymous concerns regarding accounting or auditing matters.

7.      Meet in private with internal auditors, independent auditors, compliance and senior management as it deems necessary and appropriate to perform its responsibilities.

\*      \*      \*

D.      Financial, Legal and Regulatory Risk Exposure.

1.      Inquire of management, the Company's internal auditors, and the Company's independent auditors about significant financial, legal and regulatory risks or exposures and assess the steps management has taken to minimize or control the Company's exposure to such risks; and

2.      Discuss the Company's major financial, legal and regulatory risk exposures and the steps that management has taken to monitor and control such exposures.

E.      Risk Assessment and Risk Management Processes.

1.      Oversee the Company's processes related to risk assessment and risk management; and

2.      Discuss guidelines and protocols governing the Company's risk assessment and risk management processes, as developed by the Company's management, as well as the steps that management has taken to monitor such processes.

\*      \*      \*

**V.    Authority**

The Committee's direct reporting relationship is to the Board.  The Committee is authorized to have full and unrestricted access to all personnel, records, operations,

properties, and other informational sources of the Company as required to properly discharge its responsibilities. Further, the Committee is granted the authority to conduct or authorize investigations into any matters within the Committee's scope of responsibilities. The Committee shall be empowered to retain, in its sole discretion and at the Company's expense, independent counsel, accountants, or others to assist it in the discharge of its responsibilities. In discharging its responsibilities, the Committee will have the resources and authority to cover ordinary administrative expenses as it deems appropriate at the expense of the Company.

31. The Board also has a Finance Committee. The purpose of the Finance Committee is "to advise and assist the Board in overseeing the Company's corporate finance matters." The Finance Committee's responsibilities include:

A. <u>Oversight of Corporate Finance Matters</u>. The Committee shall have the responsibility of advising and assisting the Board in overseeing the Company's corporate finance matters and to the full extent allowed by the law, shall have the power and authority to approve on behalf of the Board and/or as delegated by the Board, any and all strategies, plans, and policies in each case related to corporate finance and capital structure, to the extent such power and authority is not otherwise limited or qualified by the Board by resolution or otherwise.

B. <u>Other Duties</u>. The Committee shall carry out such other duties as may be delegated to it by the Board from time-to-time. Notwithstanding the power and authority of the Committee to act on behalf of the Board, with respect to such matters the Committee in its discretion may submit any such matter, along with its recommendation with respect thereto to the full Board for consideration and approval.

C. <u>Annual Performance Review</u>. The Committee shall submit to an annual performance review by the Nominating/Corporate Governance Committee.

D. <u>Reporting.</u> The Committee shall make a report to the full Board on activities and actions taken on a periodic basis, but no less than annually.

32. The Individual Defendants failed to maintain the standards laid out by the law and the Company itself, resulting in the breaches of fiduciary duty and violations of Section 10(b) of the Exchange Act described herein.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

33.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  The Individual Defendants caused the Company to conceal the truth and further aided and abetted and assisted each other in breaching their respective duties.

34.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to:  (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of Section 10(b) of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, and future business prospects; (iii) artificially inflate the Company's stock price; and (iv) enhance the Individual Defendants' Company positions and their profits and power stemming from such positions.

35.     The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company to purposefully or recklessly conceal material facts, fail to correct such misrepresentations, and violate applicable laws.  The actions described herein occurred under the authority of the Board, thus each of the Individual Defendants who are directors of Beazer was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

36.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of wrongdoing, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that

wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

37.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Beazer and was at all times acting within the course and scope of such agency.

## SUBSTANTIVE ALLEGATIONS

### A.    Company Background

38.    Beazer was founded in 1985 and is headquartered in Atlanta, Georgia.  Beazer is one of the largest homebuilders in the United States.  The Company designs, constructs, and sells single-family and multi-family homes, focusing on entry-level, move-up, and retirement-oriented home buyers.  For the most part, Beazer does not build "custom homes" but offers a variety of amenities and home customization options based on target markets.

39.    Beazer sells its homes through commissioned new home sales counselors and independent brokers.  Beazer's brands include, among others, Gatherings, condominium living for active adults over the age of 55, and Choice Plans, which "allows buyers to choose how primary living areas, like the kitchen and master bathroom, are configured with no extra cost."

40.    The Company operates in thirteen states – Arizona, California, Nevada Texas, Delaware, Indiana, Maryland, Tennessee, Virginia, Florida, Georgia, North Carolina, and South Carolina – which are divided into three reportable geographic regions, the West, East, and Southeast.  For the year-ended September 30, 2018, the West represented almost half of Beazer's total number of homes closed.  Specifically, the number of homes closed was 2,895 for the West region, 1,221 for the East region, and 1,651 for the Southeast region.  Similarly, the West region accounted for approximately half of the Company's backlog at year-ended September 30, 2018 with 858 of the 1,632 units in backlog.

**B.      Beazer's Land Held For Future Development**

41.      One of Beazer's reported financial metrics is "land held for future development" which is included as part of Beazer's inventory.

42.      Prior to the Relevant Period, Beazer's financial outlook had significantly increased after the housing crisis that resulted in the Housing and Economic Recovery Act of 2008 and Beazer's accounting and mortgage probe and related conviction of the Company's Chief Accounting Officer.  Beazer's stock price rose from a March 2009 low of $0.29 to $16.26 on August 1, 2014 and net losses of $189.4 million as of September 30, 2009 were cut to net losses of only $33.9 million by September 30, 2013, and net income of $34.4 million for the year-ended September 30, 2014.

43.      The West, and primarily California, is the location for the majority of Beazer's inventory.  As of September 30, 2009, Beazer held $345 million worth of land for future development in the West.  Four years later, as of September 30, 2013, that number had only decreased to $292.9 million.  Notably, the Company did not write-down these assets from 2008 onward, although housing prices continued to drop.  As subsequently revealed, despite the substantial deflation in home and land values caused by the 2008 housing crisis, Beazer failed to lower the value of its land held for future development in California and instead reported inflated values for these holdings while claiming to frequently perform impairment analyses.

**C.      The Individual Defendants Caused Beazer to Issue Materially False and Misleading Statements**

44.      On July 31, 2014, after market close, certain Individual Defendants caused Beazer to file with the SEC its quarterly report on Form 10-Q for the quarter-ended June 30, 2014 (the "3Q14 Form 10-Q").  The 3Q14 Form 10-Q was signed by defendant Salomon.  Defendants Merrill and Salomon signed certifications pursuant the Sarbanes-Oxley Act of 2002 ("SOX")

attesting to compliance with Sections 13(a) or 15(d) of the Exchange Act, and stating in relevant part, that the 3Q14 Form 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and that the "information contained in the periodic report fairly presents, in all material respects, the financial condition and results of operations of the Company."

45.    For the quarter, Beazer reported a total value of $309.5 million in land held for future development, $262.5 million of which was attributable to the Company's West segment. The 3Q14 Form 10-Q explained how the Company valued its land held for future use:

> **Inventory Valuation —** We assess our inventory assets no less than quarterly for recoverability . . . .    For those communities for which construction and development activities are expected to occur in the future or have been idled (land held for future development), all applicable interest and real estate taxes are expensed as incurred and the inventory is stated at cost unless facts and circumstances indicate that the carrying value of the assets may not be recoverable. We record assets held for sale at the lower of the carrying value or fair value less costs to sell.

46.    On November 13, 2014, Beazer filed with the SEC its annual report on Form 10-K for the year-ended September 30, 2014 (the "2014 Form 10-K"). The 2014 Form 10-K was signed by defendants Merrill, Salomon, Zelnak, B. Beazer, Acton, Alpert, Leemputte, Provencio, and Solari. Merrill and Salomon signed certifications pursuant to SOX substantially similar to those described in ¶ 44 above. The 2014 Form 10-K reported a total value of $301 million in land held for future development of which $260.9 million, or 86%, was attributable to the Company's West segment. California alone accounted for 79% of the lots held for future development for the West segment. The 2014 Form 10-K also described Beazer's land held for future development valuation:

### *Asset Valuation - Land Held for Future Development*

For those communities for which construction and development activities are expected to occur in the future or have been idled (land held for future development), all applicable interest and real estate taxes are expensed as incurred and the inventory is stated at cost unless facts and circumstances indicate that the carrying value of the assets may not be recoverable.  The future enactment of a development plan or the occurrence of events and circumstances may indicate that the carrying amount of an asset may not be recoverable.  We evaluate the potential development plans of each community in land held for future development if changes in facts and circumstances occur which would give rise to a more detailed analysis for a change in the status of a community to active status or held for development.

47.    The 2014 Form 10-K included generic, boilerplate cautionary language concerning possible risks for the Company that could negatively impact earnings, all typical to any home developer, such as market factors, macro-economic factors, and various other factors outside Beazer's control.  Specifically, the 2014 Form 10-K stated in relevant part:

### *The market value of our land and/or homes may decline, leading to impairments and reduced profitability.*

We regularly acquire land for replacement and expansion of land inventory within our existing and new markets.  The market value of land, building lots and housing inventories can fluctuate significantly as a result of changing market conditions and the measures we employ to manage inventory risk may not be adequate to insulate our operations from a severe drop in inventory values.  When market conditions are such that land values are not appreciating, previously entered into option agreements may become less desirable, at which time we may elect to forgo deposits and pre-acquisition costs and terminate the agreements. In a situation of adverse market conditions, we may incur impairment charges or have to sell land at a loss which would adversely affect our financial condition, results of operations and stockholders' equity and our ability to comply with certain covenants in our debt instruments linked to tangible net worth.

### *Our home sales and operating revenues could decline due to macro-economic and other factors outside of our control, such as changes in consumer confidence, declines in employment levels and increases in the quantity and decreases in the price of new homes and resale homes in the market.*

Changes in national and regional economic conditions, as well as local economic conditions where we conduct our operations and where prospective purchasers of our homes live, may result in more caution on the part of homebuyers and, consequently, fewer home purchases.  These economic uncertainties involve,

among other things, conditions of supply and demand in local markets and changes in consumer confidence and income, employment levels and government regulations. These risks and uncertainties could periodically have an adverse effect on consumer demand and the pricing of our homes, which could cause our operating revenues to decline. Additional reductions in our revenues could, in turn, further negatively affect the market price of our securities.

***The homebuilding industry is cyclical. A severe downturn in the industry, as recently experienced, could adversely affect our business, results of operations and stockholders' equity.***

During periods of downturn in the industry, housing markets across the United States may experience an oversupply of both new and resale home inventory, an increase in foreclosures, reduced levels of consumer demand for new homes, increased cancellation rates, aggressive price competition among homebuilders and increased incentives for home sales. In the event of a downturn, we may temporarily experience a material reduction in revenues and margins. Continued weakness in the homebuilding market could adversely affect our business, results of operations and stockholders' equity as compared to prior periods and could result in additional inventory impairments in the future.

48.     On November 10, 2015, the Company filed with the SEC its annual report on Form 10-K for the year-ended September 30, 2015 (the "2015 Form 10-K"). The 2015 Form 10-K was signed by defendants Merrill, Salomon, Zelnak, B. Beazer, Acton, Alpert, Leemputte, Provencio, and Solari. Defendants Merrill and Salomon signed certifications pursuant to SOX substantially similar to those described in ¶ 44 above. The 2015 Form 10-K reported a total value of $271 million in land held for future development of which $230.8 million, or over 85%, was attributable to Beazer's West segment. Again, California alone accounted for the majority of the 3,813 lots held for future development in the West, with 2,602, or over 68%. The 2015 Form 10-K contained the following explanation of valuation of assets held for development:

Our homebuilding inventories that are accounted for as projects in progress (held for development) include land and home construction assets grouped together as communities. Homebuilding inventories held for development are stated at cost (including direct construction costs, capitalized indirect costs, capitalized interest and real estate taxes) unless facts and circumstances indicate that the carrying value of the assets may not be recoverable. We assess these assets no less than quarterly for recoverability.

49.     The 2015 Form 10-K contained substantially similar generic boilerplate cautionary language regarding potential risks for the Company as described in ¶ 47 above.

50.     On November 15, 2016, the Individual Defendants caused the Company to file with the SEC its annual report on Form 10-K for the year-ended September 30, 2016 (the "2016 Form 10-K").  The 2016 Form 10-K was signed by defendants Merrill, Salomon, Zelnak, B. Beazer, Acton, Alpert, Leemputte, Orser, Provencio, and Solari.  Defendants Merrill and Salomon signed certifications pursuant to SOX substantially similar to those described in ¶ 44 above.  The 2016 Form 10-K reported a total value of $213 million in land held for future development of which $172 million, or over 80%, was attributable to Beazer's West segment.  California accounted for the majority of the West segment's 2,975 lots held for future development, with 2,136, or over 71%.

51.     The 2016 Form 10-K claimed that the negative impact to gross margins was, in part, the result of "activation of assets formerly classified as land held for future development, which generally have lower margins" and that the Company "continued to activate certain parcels of land held for future development so that these assets can begin to generate revenue for the Company."  It also contained an explanation of valuation of assets held for development and asserted that Beazer conducted a "community level review for the recoverability of [its] homebuilding inventory" and in certain situations performed "a formal impairment analysis[,]" stating in relevant part:

> Our homebuilding inventories that are accounted for as held for development (projects in progress) include land and home construction assets grouped together as communities.  Homebuilding inventories held for development are stated at cost (including direct construction costs, capitalized indirect costs, capitalized interest and real estate taxes) unless facts and circumstances indicate that the carrying value of the assets may not be recoverable.  We assess these assets no less than quarterly for recoverability.  Generally, upon the commencement of land development activities, it may take three to five years (depending on, among other things, the

size of the community and its sales pace) to fully develop, sell, construct and close all the homes in a typical community. Recoverability of assets is measured by comparing the carrying amount of an asset to future undiscounted cash flows expected to be generated by the asset. If the expected undiscounted cash flows generated are expected to be less than its carrying amount, an impairment charge is recorded to write down the carrying amount of such asset to its estimated fair value based on discounted cash flows.

When conducting our community level review for the recoverability of our homebuilding inventory related to projects in progress, we establish a quarterly "watch list" of communities that carry profit margins in backlog or in our forecast that are below a minimum threshold of profitability, as well as recent closings that have gross margins less than a specified threshold. In our experience, this threshold represents a level of profitability that may be an indicator of conditions that would require an asset impairment, but does not necessitate that such an impairment is warranted without additional analysis. Each community is first evaluated qualitatively to determine if there are temporary factors driving the low profitability levels. Following our qualitative evaluation, communities with more than 10 homes remaining to close are subjected to substantial additional financial and operational analyses and review that consider the competitive environment and other factors contributing to profit margins below our watch list threshold. For communities where the current competitive and market dynamics indicate that these factors may be other than temporary, which may call into question the recoverability of our investment, a formal impairment analysis is performed. The formal impairment analysis consists of both qualitative competitive market analyses and a quantitative analysis reflecting market and asset specific information.

52.    The 2016 Form 10-K contained substantially similar generic boilerplate cautionary language regarding potential risks for the Company as described in ¶ 47 above.

53.    On November 14, 2017, Beazer filed with the SEC its annual report on Form 10-K for the year-ended September 30, 2017 (the "2017 Form 10-K"). The 2017 Form 10-K was signed by defendants Merrill, Salomon, Zelnak, B. Beazer, Acton, Alpert, Leemputte, Orser, Provencio, and Shepherd. Merrill and Salomon signed certifications pursuant to SOX substantially similar to those described in ¶ 44 above. The 2017 Form 10-K reported a total value of $112.6 million in land held for future development of which $87.2 million, or 77%, was attributable to the Company's West segment. California alone accounted for 75% of the lots held for future development for the West segment, or 828 of the 1,100 lots.

25

54.    The 2017 Form 10-K again claimed that negative impact to gross margins was, in part, the result of "activation of assets formerly classified as land held for future development, which generally have lower margins" and represented that such activation was one of a "number of strategies" the defendants were implementing "to improve capital efficiency."  Moreover, the 2017 Form 10-K touted that "[d]uring the current fiscal year, [Beazer's] land held for future development balance ha[d] declined by approximately $100 million" due to "activat[ion] [of] multiple parcels for homebuilding activities."

55.    The 2017 Form 10-K also contained language substantially similar to previous annual reports describing Beazer's land held for future development valuation, stating:

> Our homebuilding inventories that are accounted for as held for development (projects in progress) include land and home construction assets grouped together as communities. Homebuilding inventories held for development are stated at cost (including direct construction costs, capitalized indirect costs, capitalized interest and real estate taxes) unless facts and circumstances indicate that the carrying value of the assets may not be recoverable. We assess these assets no less than quarterly for recoverability. Generally, upon the commencement of land development activities, it may take three to five years (depending on, among other things, the size of the community and its sales pace) to fully develop, sell, construct and close all the homes in a typical community. Recoverability of assets is measured by comparing the carrying amount of an asset to future undiscounted cash flows expected to be generated by the asset. If the expected undiscounted cash flows generated are expected to be less than its carrying amount, an impairment charge is recorded to write down the carrying amount of such asset to its estimated fair value based on discounted cash flows.
>
> When conducting our community level review for the recoverability of our homebuilding inventory related to projects in progress, we establish a quarterly "watch list" of communities that carry profit margins in backlog or in our forecast that are below a minimum threshold of profitability, as well as recent closings that have gross margins less than a specified threshold. In our experience, this threshold represents a level of profitability that may be an indicator of conditions that would require an asset impairment, but does not necessitate that such an impairment is warranted without additional analysis. Each community is first evaluated qualitatively to determine if there are temporary factors driving the low profitability levels. Following our qualitative evaluation, communities with more than ten homes remaining to close are subjected to substantial additional financial and operational analyses and review that consider the competitive environment and other factors contributing to profit margins below our watch list threshold. For

communities where the current competitive and market dynamics indicate that these factors may be other than temporary, which may call into question the recoverability of our investment, a formal impairment analysis is performed. The formal impairment analysis consists of both qualitative competitive market analyses and a quantitative analysis reflecting market and asset specific information.

56.     The 2017 Form 10-K contained substantially similar generic boilerplate cautionary language regarding potential risks for the Company as described in ¶ 47 above.

57.     On November 13, 2018, the Company filed with the SEC its annual report on Form 10-K for year-ended September 30, 2018 (the "2018 Form 10-K"). The 2018 Form 10-K was signed by defendants Merrill, Salomon, Zelnak, B. Beazer, Acton, Alpert, Leemputte, Orser, Provencio, and Shepherd. Merrill and Salomon signed certifications pursuant to SOX substantially similar to those described in ¶ 44 above. The 2018 Form 10-K reported a total value of $83.2 million in land held for future development of which $58.1 million, or 70%, was attributable to the Company's West segment. Once again, California accounted for the majority of the West segment's 817 lots held for future development, with 578, or over 70%.

58.     Under the 2018 Form 10-K's "Long-Term Business Strategy" section, the Individual Defendants stated that "[t]o improve [Beazer's] return on assets, [the Company] expect[s] to benefit from [*inter alia*] the activation of a number of assets that were previously classified as land held for future development[.]" The 2018 Form 10-K touted how "[d]uring the current fiscal year, [Beazer's] land held for future development balance declined by approximately $29.4 million due to the activation of multiple parcels for homebuilding activities, leaving a remaining balance of $83.2 million as of September 30, 2018." And yet, the 2018 Form 10-K still noted that, going forward, the Company's gross margins would be negatively impacted by the "activation of land assets formerly classified as land held for future development, which generally have lower margins[.]"

59.     The 2018 Form 10-K also contained language substantially similar to previous annual reports describing Beazer's land held for future development valuation, stating:

> Our homebuilding inventories that are accounted for as held for development (projects in progress) include land and home construction assets grouped together as communities.  Homebuilding inventories held for development are stated at cost (including direct construction costs, capitalized indirect costs, capitalized interest, and real estate taxes) unless facts and circumstances indicate that the carrying value of the assets may not be recoverable.  We assess these assets no less than quarterly for recoverability.  Generally, upon the commencement of land development activities, it may take three to five years (depending on, among other things, the size of the community and its sales pace) to fully develop, sell, construct, and close all of the homes in a typical community.  Recoverability of assets is measured by comparing the carrying amount of an asset to future undiscounted cash flows expected to be generated by the asset.  If the expected undiscounted cash flows generated are expected to be less than its carrying amount, an impairment charge is recorded to write down the carrying amount of such asset to its estimated fair value based on discounted cash flows.
>
> When conducting our community level review for the recoverability of our homebuilding inventory related to projects in progress, we establish a quarterly "watch list" of communities that carry profit margins in backlog or in our forecast that are below a minimum threshold of profitability, as well as recent closings that have gross margins less than a specified threshold. In our experience, this threshold represents a level of profitability that may be an indicator of conditions that would require an asset impairment but does not necessitate that such an impairment is warranted without additional analysis.  Each community is first evaluated qualitatively to determine if there are temporary factors driving the low profitability levels.  Following our qualitative evaluation, communities with more than ten homes remaining to close are subjected to substantial additional financial and operational analyses and reviews that consider the competitive environment and other factors contributing to profit margins below our watch list threshold. For communities where the current competitive and market dynamics indicate that these factors may be other than temporary, which may call into question the recoverability of our investment, a formal impairment analysis is performed. The formal impairment analysis consists of both qualitative competitive market analyses and a quantitative analysis reflecting market and asset specific information.

60.     The 2018 Form 10-K contained substantially similar generic boilerplate cautionary language regarding potential risks for the Company as described in ¶ 47 above.

61.     On February 4, 2019, the Company filed with the SEC its quarterly report on Form 10-Q for the quarter-ended December 31, 2018 (the "1Q19 Form 10-Q").  The 1Q19 Form 10-Q

was signed by defendant Salomon and contained certifications signed by defendants Merrill and Salomon substantially similar to those described in ¶ 44 above.  The 1Q19 Form 10-Q reported a total value of $83.2 million in land held for future development of which $58.1 million, or 70%, was attributable to the Company's West segment.

62.     The 1Q19 Form 10-Q contained language substantially similar to the Company's annual reports describing Beazer's land held for future development valuation, including its community by community review, and for the quarter took a de minimis impairment, stating in relevant part:

> When conducting our community level review for the recoverability of inventory related to projects in progress, we establish a quarterly "watch list" comprised of communities that carry profit margins in backlog and in our forecast that are below a minimum threshold of profitability.  We also include in our watch list communities with recent closings that have gross margins less than a specific threshold.  Each community is first evaluated qualitatively to determine if there are temporary factors driving the low profitability levels.  Following our qualitative evaluation, communities with more than ten homes remaining to close are subjected to substantial additional financial and operational analysis and review that considers the competitive environment and other factors contributing to gross margins below our watch list threshold.  Our assumptions about future home sales prices and absorption rates require significant judgment because the residential homebuilding industry is cyclical and is highly sensitive to changes in economic conditions.  For certain communities, we determined that it is prudent to reduce sales prices or further increase sales incentives in response to a variety of factors, including competitive market conditions in those specific submarkets for the product and locations of these communities.  For communities where the current competitive and market dynamics indicate that these factors may be other than temporary, which may call into question the recoverability of our investment, a formal impairment analysis is performed.  The formal impairment analysis consists of both qualitative competitive market analyses and a quantitative analysis reflecting market and asset specific information.  Market deterioration that exceeds our initial estimates may lead us to incur impairment charges on previously impaired homebuilding assets, in addition to homebuilding assets not currently impaired but for which indicators of impairment may arise if markets deteriorate.
>
> For the quarter ended December 31, 2018, there were four communities that were included in our watch list that required further analysis to be performed after considering the number of lots remaining in each community and certain other qualitative factors.  This additional analysis led to a $1.0 million impairment charge for one of these communities, principally due to a reduction in price that is other

than temporary based on current competitive and market dynamics. For the quarter ended December 31, 2017, there were two communities on our quarterly watch list. However, none of these communities required further impairment analysis to be performed after considering certain qualitative factors.

63. The Individual Defendants continued to tout their strategy of "activating" assets formerly classified as land held for future development in order to improve capital efficiency, while noting that the strategy negatively impacted Beazer's gross margins, and would continue to do so going forward.

64. The above statements identified in ¶¶ 44-63 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants caused the Company to make materially false and/or misleading statements and fail to disclose that: (1) Beazer's California assets classified as lands held for future development had significantly deteriorated, were continuing to deteriorate, and/or were improperly valued for a significant amount of time; (2) as a result, there was a foreseeable risk of an eventual substantial impairment that would negatively impact the Company's financials; and (3) as a result of the foregoing, the Company's statements about Beazer's business, operations, and prospects, were materially false and/or misleading and/or lacked a reasonable basis.

D. **The Truth is Revealed**

65. On May 2, 2019, Beazer issued a press release announcing its financial results for the second quarter of 2019 (the "May 2019 Press Release"), also filed as Exhibit 99.1 to the Form 8-K filed with the SEC the same day. The May 2019 Press Release revealed a net loss from continuing operations of $100.8 million for the second quarter, an increase of $112.5 million compared to the second quarter of 2018. The shocking net loss was a result of a $147.6 million impairment on certain California assets the Company had acquired before 2007, over ten years

prior.  According to Beazer, all of the assets at issue were either currently or previously classified as land held for future development.  Defendant Merrill stated in relevant part:

> During the quarter, we also took impairments on several of our California assets. In response to recent changes in market conditions, we concluded that it had become necessary to reduce prices in some of our active communities, all of which were previously classified as land held for future development.  Additionally, after a thorough review of our California assets, we made a strategic decision to sell or activate all of the remaining assets which were still classified as land held for future development.  Although these decisions led to an impairment this quarter, our actions will enable us to increase our sales pace, generate cash more quickly and redeploy this capital to more attractive investments.
>
> *            *            *
>
> *Impairments.*  Of the total impairments during the quarter, $109.0 million related to 9 formerly land held for future development communities that are currently generating sales or are under development in Southern California and reflected the deterioration in conditions that occurred in their respective markets.  Concurrently, the Company performed a strategic review of its remaining land held for future development assets in California and now plans to sell all of these parcels.  As a result, land held for sale impairment charges totaling $38.6 million were recognized on 6 of these communities.  The Company no longer has any land held for future development assets in California.

66.     On the second quarter 2018 earnings conference call that same day, defendant Merrill provided additional information on the impairments caused by the California assets classified as land held for future development, stating, in relevant part:

> Of course, the other big news in the second quarter was the impairments on certain California assets.  These non-cash impairments totaled $148 million on a pre-tax basis and $107 million on an after-tax basis.  The impairments related to 15 assets, all of which were currently or previously classified as land held for future development.  14 of these assets were acquired before 2007.
>
> The impairments occurred in two categories: the first related to 9 projects that are under development or are actively selling.  Assets that fell into this category contributed $109 million of the pre-tax impairment and were spread across Southern California.  The second category related to 6 communities that we have decided to sell that were still classified as land held for future development.  The pre-tax impairment related to these assets was $39 million, split between Northern and Southern California.  After these adjustments, we have no remaining land held for future development in California.

67.     Analysts were quick to note the ten-plus year vintage of the impaired assets, but defendant Merrill would only respond vaguely to their concerns:

**Alan S. Ratner** Zelman & Associates LLC-MD:

So on the impaired projects, sounds like they've been on the books for a while, have they been previously impaired during the downturn?  Or was this the first charge that you took on them?

**Allan P. Merrill** Beazer Homes USA, Inc. – CEO, President & Director:

I would be a little reluctant to answer it definitively.  One or more of them may have had an impairment, but they have not been impaired since 2007 or '08 because once they went into the land held category where the assessment was, they could be recovered, they weren't annually tested for impairment in the same way.  So it's reasonably fair to assume they were largely untouched.

68.     On this news, Beazer's stock price dropped $1.73 per share, or 12.15%, from a closing price per share of $14.24 on May 2, 2019 to a closing price per share of $12.51 on May 3, 2019, wiping out almost $55 million in market capitalization.  Beazer's stock price continued to be negatively affected over the next several days, falling to $10.19 on May 13, 2019, approximately a $130 million market capitalization drop.

## DAMAGES TO BEAZER

69.     As a result of the Individual Defendants' wrongful conduct alleged herein, Beazer disseminated false and misleading statements and omitted material information that would have rendered the statements neither false nor misleading.  The improper statements have devastated the Company's credibility.  Beazer has been, and will continue to be, severely damaged by the Individual Defendants' misconduct.

70.     Indeed, the Individual Defendants' false and misleading statements as alleged herein, have subjected Beazer to the Securities Class Action, resulting in costs incurred and continuing to be incurred in defending the Securities Class Action and any related settlement.

Additionally, Beazer has expended, and will continue to expend, costs from compensation and benefits paid to Individual Defendants who breached their duties to the Company.

71.     As a direct and proximate result of the Individual Defendants' actions as alleged herein, Beazer's market capitalization has been substantially damaged, and has lost millions of dollars in value.

72.     Moreover, these actions have irreparably damaged Beazer's corporate image and goodwill.  For at least the foreseeable future, Beazer will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Beazer's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DEMAND AND DERIVATIVE ALLEGATIONS

73.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

74.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties.

75.     Plaintiff owns Beazer common stock and owned Beazer common stock at all times relevant hereto.

76.     Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting its rights.

77.     As a result of the facts set forth herein, Plaintiff has not made any demand on the Board to institute this action against the Individual Defendants.  Such a demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

78.     At the time this action was commenced, the Board consisted of eleven directors: defendants Merrill, Zelnak, B. Beazer, Acton, Alpert, Leemputte, Orser, Provencio, and Shepherd, and recently appointed non-defendant directors David Spitz and Chris Wrinkle.  Nine of the eleven members of the Board (all defendants here) are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

**A.     Demand is Futile as to Defendants Merrill, Zelnak, B. Beazer, Acton, Alpert, Leemputte, Orser, Provencio, and Shepherd Because They Each Face a Substantial Likelihood of Liability**

79.     Defendants Merrill, Zelnak, B. Beazer, Acton, Alpert, Leemputte, Orser, Provencio, and Shepherd all face a substantial likelihood of liability for their individual misconduct.  Merrill, Zelnak, B. Beazer, Acton, Alpert, Leemputte, and Provencio were directors throughout the time of the false and misleading statements, and as such had a fiduciary duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations on behalf of the Company concerning its business, operations, prospects, internal controls, and financial statements were accurate.  Similarly, defendants Orser and Shepherd had a fiduciary duty to ensure the Company's SEC filings, press releases, and other public statements and presentations on behalf of the Company concerning its business, operations, prospects, internal controls, and financial statements were accurate since the time of their directorships.  Notably, Merrill, Zelnak, B. Beazer, Alpert, Leemputte, and Provencio have served as directors and/or executive officers of the Company since the time of the housing crisis.

80.     Moreover, Merrill, Zelnak, B. Beazer, Acton, Alpert, Leemputte, Orser, Provencio, and Shepherd, as directors, owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's assets were being valued correctly, and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care.  Instead, they knowingly and consciously reviewed,

authorized, and/or caused the publication of the materially false and misleading statements discussed above that caused the Company's stock to trade at artificially inflated prices.

81.    Merrill, Zelnak, B. Beazer, Acton, Alpert, Leemputte, Orser, Provencio, and Shepherd consciously and knowingly made or authorized false and misleading statements, failed to timely correct such statements, failed to take necessary and appropriate steps to ensure that the Company's assets were being valued correctly, and failed to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required diligence. These actions constitute breaches of the fiduciary duties of loyalty and good faith, for which Merrill, Zelnak, B. Beazer, Acton, Alpert, Leemputte, Orser, Provencio, and Shepherd face a substantial likelihood of liability. If Merrill, Zelnak, B. Beazer, Acton, Alpert, Leemputte, Orser, Provencio, and Shepherd were to bring a suit on behalf of Beazer to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability. This is something they will not do. For this reason, demand is futile as to Merrill, Zelnak, B. Beazer, Acton, Alpert, Leemputte, Orser, Provencio, and Shepherd.

**B.    Additional Reasons Merrill Lacks Independence**

82.    Merrill is not disinterested for purposes of demand futility because his principal occupation is President and CEO of Beazer. According to the Company's SEC filings, in 2018 alone, Merrill received total compensation of $6,152,170. This amount is material to him.

83.    Further, Merrill is incapable of considering a demand to commence and vigorously prosecute this action because he faces additional substantial likelihood of liability as he is a named defendant in the Securities Class Action.

**C.**     **Demand is Excused as to Zelnak, Acton, Leemputte, Provencio, and Shepherd Because as Members of the Audit Committee They Face a Substantial Likelihood of Liability**

84.     Defendants Zelnak, Acton, Leemputte, Provencio, and Shepherd, as members of the Audit Committee during the Relevant Period, participated in and knowingly approved the filing of false financial statements and allowed the Individual Defendants to repeatedly make other false and misleading statements to the investing public.  More specifically, as members of the Audit Committee, Zelnak, Acton, Leemputte, Provencio, and Shepherd were obligated to review the Company's annual and quarterly reports to ensure their accuracy.  Instead, Zelnak, Acton, Leemputte, Provencio, and Shepherd, as members of the Audit Committee, failed to ensure the integrity of the Company's financial statements and financial reporting process, the Company's systems of internal accounting and financial controls and other financial information provided by the Company, as required by the Audit Committee Charter.  For this reason, demand is futile as to Zelnak, Acton, Leemputte, Provencio, and Shepherd.

## COUNT I

**Breach of Fiduciary Duty
(Against the Individual Defendants)**

85.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

86.     The Individual Defendants owed and owe Beazer fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe Beazer the highest obligation of loyalty, good faith, due care, oversight, and candor.

87.     All of the Individual Defendants violated and breached their fiduciary duties of loyalty, good faith, due care, oversight, and candor.

88.     Specifically, each of the Individual Defendants intentionally or recklessly caused the Company to fail to disclose that:  (1) Beazer's California assets classified as lands held for future development had significantly deteriorated, were continuing to deteriorate, and/or were improperly valued for a significant amount of time; (2) as a result, there was a foreseeable risk of an eventual substantial impairment that would negatively impact the Company's financials; and (3) as a result of the foregoing, the Company's statements about Beazer's business, operations, and prospects, were materially false and/or misleading and/or lacked a reasonable basis.  These actions caused severe risks to the Company's financial viability and are actually causing harm to the Company by subjecting the Company to the Securities Class Action.  The Individual Defendants had actual knowledge of the above misrepresentations and omissions of material facts, or acted with reckless disregard for the truth in failing to ascertain and disclose such facts even though such facts were available to them.

89.     As a direct and proximate result of the Individual Defendants' conscious failure to perform their fiduciary obligations, Beazer has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.  The Individual Defendants breached their fiduciary duties owed to Beazer and its stockholders by willfully, consciously, and/or intentionally failing to perform their fiduciary duties.  They caused the Company to waste valuable assets and unnecessarily expend corporate funds.  They also failed to properly oversee Beazer's business, rendering them personally liable to the Company.

90.     Plaintiff, on behalf of Beazer, has no adequate remedy at law.

## COUNT II

**Unjust Enrichment**
**(Against the Individual Defendants)**

91.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as if fully set forth herein.

92.     By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Beazer.  The Individual Defendants were unjustly enriched by their receipt of compensation while breaching fiduciary duties owed to Beazer.

93.     Plaintiff, as a stockholder and representative of the Company, seeks restitution from the Individual Defendants, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants, and each of them, as a result of their wrongful conduct and fiduciary breaches.

94.     Plaintiff, on behalf of Beazer, has no adequate remedy at law.

## COUNT III

**Contribution Under Sections 10(b) and 21D of the Exchange Act**
**(Against the Merrill and Salomon)**

95.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as if fully set forth herein.

96.     This claim is brought derivatively on behalf of the Company for contribution and indemnification against defendants Merrill and Salomon, each of whom is a named defendant in the Securities Class Action.

97.     Beazer is named as defendant in the Securities Class Action which asserts claims for violations of Section 10(b) and Section 20(a) of the Exchange Act.  If Beazer is ultimately found liable for these violations of federal securities laws, the Company's liability will arise, in whole or in part, from the intentional, knowing, or reckless acts or omissions of Merrill and Salomon as

alleged herein.   The Company is entitled to receive contribution from those defendants in connection with the Securities Class Action against the Company.

98.   As directors and officers of Beazer, Merrill and Salomon had the power and/or authority to, and did, directly or indirectly control or influence the Company's business operations and financial affairs, including the content of public statements about Beazer, and had the power and/or ability directly or indirectly to control or influence the specific corporate statements and conduct that violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 as alleged above.

99.   Merrill and Salomon are also liable under 15 U.S.C. § 78j(b), pursuant to which there is a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4, which governs application of any private right of action for contribution asserted.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of Beazer, demands judgment as follows:

A.   Declaring that Plaintiff may maintain this derivative action on behalf of Beazer and that Plaintiff is an adequate representative of the Company;

B.   Determining that demand on the Board is excused as futile;

C.   Declaring that each of the Individual Defendants breached and/or aided and abetted the breach of their fiduciary duties to Beazer;

D.   Awarding, against all of the Individual Defendants and in favor of the Company, the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, unjust enrichment, and contribution for violations of federal securities laws;

E.   Directing Beazer to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its stockholders from a recurrence of the damaging events described herein;

F.  Determining and awarding to Beazer restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by them;

G.  Granting appropriate equitable relief to remedy the Individual Defendants' breaches of fiduciary duties and other violations of law;

H.  Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, and costs and expenses; and

I.  Granting such other and further relief as the Court deems just and proper.

### JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:  August 27, 2019

Respectfully submitted,

**WEISSLAW LLP**

/s/ *Michael A. Rogovin*
Michael A. Rogovin
Georgia Bar No. 780075
476 Hardendorf Ave. NE
Atlanta, GA 30307
Tel.: (404) 692-7910
Fax: (212) 682-3010
mrogovin@weisslawllp.com

**BRAGAR EAGEL & SQUIRE, P.C.**
Marion C. Passmore
101 California Street, Suite 2710
San Francisco, California 94111
Telephone:  (415) 365-714
Email:  *passmore@bespc.com*

*Attorneys for Plaintiff Jared Abrams*